UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ARTHUR R. POWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-CV-0658-CVE-FHM |
| | ) | |
| FARMERS INSURANCE COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Now before the Court is Farmers Insurance Company, Inc.'s Motion for Summary Judgment
(Dkt. #28).  Defendant Farmers Insurance Company, Inc. ("Farmers") requests summary judgment
on plaintiff's claims for breach of contract and bad faith.  Plaintiff responds that there is a genuine
issue of material fact as to whether he suffered a covered theft loss under his homeowner's insurance
policy and Farmers lacked any legitimate basis to deny his claim.

**I.**

Arthur Powell ("Powell") married Robyn Price in February 2003 and they purchased a house
located at 1531 Vista Road in Bartlesville, Oklahoma.  Robyn Powell and her moved children
moved into the home with Arthur Powell.  Between December 2005 and February 2006, Robyn
Powell moved out of the house and Arthur Powell filed for divorce in Washington County,
Oklahoma.  In the divorce decree,  Arthur Powell was awarded two vehicles and the house, and

Robyn Powell was awarded all personal property and her children's belongings.[1] Dkt. # 28, Ex. 3. In August 2006, Arthur Powell permitted Robyn Powell and her children to move back into the house. Arthur Powell has provided conflicting explanations as to why he allowed Robyn Powell to move in. In a sworn examination under oath ("EUO"), Arthur Powell stated that they had "decided to reconcile and she moved into the Vista house." Id., Ex. 4, at 7. However, in his deposition, Arthur Powell stated that he did not make any promise or commitment to attempt reconciliation, but they agreed to talk about things. His deposition testimony suggests he allowed Robyn Powell to move into the home to permit her children to remain in the same school district. Dkt. # 32, Ex. 9, at 3.

In early October 2006, Arthur Powell accepted a temporary job with a roofing company in Colorado and he subsequently received an offer for full-time employment in Colorado. Robyn Powell flew to Colorado on approximately October 15, 2006, and they picked out a home to purchase. Robyn Powell returned to Oklahoma alone and Arthur Powell did not hear from her for a few days. He asked a friend, Jamie Johnston, to check on Robyn Powell and the house. Johnston approached the house and noticed that the front door was unlocked. He entered the house and discovered that everything had been stolen. Arthur Powell immediately left Colorado and returned to his house in Oklahoma. He called the Bartlesville Police Department ("BPD") to report a theft and identified Robyn Powell as the suspect. Dkt. # 28, Ex. 5. He notified Farmers, his homeowner's insurance company, of the theft on October 22, 2006. Powell's homeowner's insurance policy

---

[1]     Plaintiff misquotes the language of the divorce decree. The decree clearly awards plaintiff "all personal property," and it does not distinguish between Arthur or Robyn Powell's property. Dkt. # 28, Ex. 3. Even if the parties had an informal understanding that differed from the plain language of the divorce decree, plaintiff's claims that Robyn Powell was entitled only to "her" personal property is not supported by the record. Dkt. # 32, at 20.

covered the theft of personal property from a "residence premises" or "insured location." <u>Id</u>., Ex. 1, at 3. However, the policy excluded coverage for thefts "committed by an **insured**" or "committed by any **person** regularly residing on the **insured location**." <u>Id</u>. at 4. In the policy, Farmers reserved the right to void the entire policy if "any **insured** has knowingly and willfully concealed or misrepresented any material fact or circumstance relating to this insurance before or after the loss." <u>Id</u>. at 8. Powell told Farmers that Robyn Powell was permitted to live in the home and he believed that she was responsible for the theft. <u>Id</u>., Ex. 6. Arthur Powell estimated that the value of the stolen items was $25,000 to $30,000.

A customer service representative from Farmers, Amanda Sanders, called Powell on October 25, 2006 to discuss his claim. He told Sanders that he had a list of witnesses who watched Robyn Powell and her children remove items from the house. <u>Id</u>., Ex. 7. Sanders told Powell that Robyn Powell was still listed as an insured person on the policy and this would create an issue concerning insurance coverage. Sanders stated that she would call Powell's insurance agent to verify whether Robyn Powell was removed as an insured. The agent told Sanders that Powell had not removed Robyn Powell from the policy. Sanders spoke to Powell later that day and informed him that the theft of personal belongings by a insured person was not a covered loss under the policy. <u>Id</u>., Ex. 8.

Powell called Sanders on October 26, 2006 with a different explanation for the theft of his property. He claimed that witnesses would testify that Robyn Powell took some items from the house but left the front door open. He stated that, before he returned from Colorado, several unidentified persons, who were not named insureds or residents of the house, allegedly entered the home and stole more of Powell's personal belongings. He also claimed that the Bartlesville Police

Department would not investigate the theft.  He told Sanders that if "someone would come 'lean' on the police, we could work with them and get his property back since he is aware of where most of it is and then 'we wouldn't have a claim to pay at all.'" Id., Ex. 9.  Sanders also received a voice mail from  Powell's agent, who stated that Robyn Powell had been removed from the homeowner's policy.  Id.  Sanders decided not to send a denial letter until the matter of Robyn Powell's status on the policy had been cleared up.

Sanders called Powell on October 27, 2006 and advised him that he needed to complete a proof of loss ("POL") and an authorization to obtain information ("Authorization").  Id., Ex. 10. Powell stated that he would be returning to Colorado but mail could be sent to his mother's address in Oklahoma City, Oklahoma.  Sanders sent the required forms to Powell.  She contacted Powell's agent and he confirmed that Powell made a request to remove Robyn Powell from the policy on March 16, 2006.  Sanders also created a special investigation unit for Powell's claim due to the following indicators:

- Large loss
- Insured recently divorced
- Claim originally reported as theft by ex wife on policy and still living in home
- Claim was then reported as theft by numerous others not insured on policy
- No forced entry
- Discrepancy in agent information concerning who was listed on policy

Id.  Sanders referred Powell's claim to the special investigation unit and investigator Shaun Spaeth was assigned to the claim on October 30, 2006.  Id., Ex. 12.

Sanders spoke to Powell on November 21, 2006.  He claimed that Robyn Powell had admitted to taking her clothes and her children's belongings and she left the door to the house unlocked after she left.  Id., Ex. 13.  He stated that "talk in the town" circulated that his house was unlocked and he suspected certain individuals of stealing his property.  He did not want to complete

the POL until he knew if he could recover his property from these suspects, and Sanders advised Powell that he could withdraw his claim without prejudicing his right to refile the claim at a later date. He agreed that he would withdraw his claim. Sanders sent a letter confirming her conversation with Powell and the withdrawal of his claim on November 27, 2006.

In December 2006, Powell was subpoenaed by Robyn Powell's ex-husband, Paul White, to testify at a custody hearing and Powell claims that he testified against Robyn Powell at the hearing. Id., Ex. 4, at 14. Powell met his ex-wife for lunch and he presented her with an affidavit he had prepared. The affidavit listed property that was allegedly stolen from his house on October 20, 2006, and it stated that Robyn Powell "did not steal any of the above listed items." Id., Ex. 15, at 2. Robyn Powell signed the affidavit on December 28, 2006. On January 10, 2007, Farmers received a letter from Clint Parsons, an attorney representing Powell, and Farmers reopened Powell's theft claim. Farmers sent Parsons a new POL and Authorization for Powell to complete before February 9, 2007. Powell did not complete the POL by February 9, 2007. On February 12, 2007, Farmers sent him a letter noting his failure to cooperate with its investigation and extended his time to complete the POL until February 26, 2007. Id., Exs. 19, 20.

Farmers received Powell's POL on February 19, 2007, and it included 98 pages of supporting documentation. Powell included a list of 221 items that were allegedly stolen from his home and he provided values for the missing items. However, Farmers found significant deficiencies in Powell's POL and rejected it because:

> □ The Sworn Statement in Proof of Loss does not notate the contents damages you are claiming. While I acknowledge a property list was provided in the 98 page fax, no clear dollar amount of contents damages was listed on the Proof of Loss.

□ No description of building damage was provided. Damages were notated on the Proof of Loss in the amount of $600 for building coverage. This dollar amount was not detailed in any portion of the Proof of Loss or the supporting documents provided.

□ No signature was on the Proof of Loss. This does need to be signed by every party claiming a right to the property being claimed on the form.

□ The Proof of Loss was not notarized. This document does need to be notarized and returned when completed.

Id., Ex. 24, at 1. Farmers extended Powell's deadline to submit a properly completed POL until March 7, 2007 and sent him a new POL form. Powell's POL also included a handwritten note stating "NO ATTORNEY INVOLVED." Farmers contacted Parsons and Parson was not aware that Powell had terminated their attorney/client relationship. Until Farmers received confirmation that Powell was no longer represented by an attorney, Farmers informed Parson that it would continue to send correspondence to Parsons concerning Powell's claim.

Spaeth reopened his investigation of Powell's claim and contacted the BPD. He learned that BPD Officer Dan Barnhart investigated Powell's allegations and Officer Barnhart had interviewed Johnston and Robyn Powell immediately following the alleged theft. Johnston told Officer Barnhart that he went by the house and saw Robyn Powell removing Powell's belongings from the house. Robyn Powell denied taking any items except those items awarded to her in the divorce decree, but she admitted that she left the house unlocked. Officer Barnhart believed the case was a civil matter and the district attorney decided not to prosecute Robyn Powell for theft. Id., Ex. 25. Officer Barnhart had retired before Spaeth could speak to him; Speath received this information from an BPD Officer Jim Elliot. Spaeth investigated Powell's financial history and discovered that the federal government had a pending tax lien against Powell for $11,360. Spaeth also found a civil lawsuit filed by a roofing supply company against Powell's business, Randy's Roofing &

6

Construction LLC ("Randy's Roofing"), for indebtedness in excess of $10,000.   Spaeth unsuccessfully attempted to contact three potential witnesses, Johnston, TJ Wilson, and Tammy Wilson, and left messages for them.

Powell's claim was reassigned to customer representative Jenifer Cornwell on February 28, 2007.  Parsons notified Farmers that he no longer represented Powell and Farmers requested a retraction letter.  On March 13, 2007, Powell informed Farmers that he had moved to Florida and had no plans to return to Oklahoma.  Farmers needed to take a recorded statement from Powell to proceed with his claim, but advised him that he could meet with an investigator located in Florida. Farmers had still not received a retraction letter from Parsons.[2]   Powell claimed that he remained friends with Robyn Powell and had seen many of his belongings in her home.  He provided Farmers with Robyn Powell's contact information, and Farmers asked him not to contact his ex-wife until Farmers was ready interview Robyn Powell.

As of March 21, 2007, Farmers not received an updated POL from Powell and sent him another failure to cooperate letter.  Farmers assigned another customer representative, William Hamline, to Powell's claim to retain a local investigator.  Hamline called Powell on March 29, 2007 and talked to Powell about his claim.  Powell stated that Robyn Powell was "responsible for the theft," although she may have had help.  Id., Ex. 36.  Powell claimed that Robyn Powell may have given away or sold some of his property, because she did not have enough space to store all the items that were allegedly stolen.  However, he could not identify any of the individuals that may have assisted Robyn Powell.  He also expressed frustration with the BPD's decision not to treat the matter as a criminal case.

---

[2]        Farmers subsequently received a retraction letter from Parsons on March 23, 2007.

7

Powell gave a recorded statement on April 4, 2007.  He stated that he learned of the theft on the morning of October 20, 2006, when his friend visited the house.  The investigator asked Powell about his statement to Farmers immediately following the incident when he accused Robyn Powell of stealing his belongings.  Powell stated:

> At one time I stated that right after that.  When I called the insurance, I told them that.  It was all emotionally charged and driven.  The fact is, I wasn't there and I don't know what happened other that [sic] what my neighbors tell me that they saw, and that my house is empty.  Those are the only facts that I know.

Id,. Ex. 2, at 6.  He also stated that he has asked Robyn Powell about the theft and she refuses to talk to him about the incident.  He claims that his neighbors saw Robyn Powell's children removing items from the home, but Robyn Powell was not there.  Powell also discussed the alleged theft of business property by his former business manager, Wade Fisher.  However, Powell's business insurance lapsed due to Fisher's failure to pay the premiums, and he never made a claim for this loss.  Powell claims that former employees of Randy's Roofing may also have assisted Robyn Powell remove items from his home.  The investigator asked Powell about the BPD's investigation of the incident.  Powell claims that Robyn Powell called him and described her interview with Officer Barnhart.  Robyn Powell allegedly told Powell that Barnhart "did everything but ask [her] out," and Officer Barnhart declined her invitation to look around her house.  Id. at 32.  Powell did not know if Robyn Powell "was rubbing it in [his] face" or if she was being kind by advising him the police interviewed her.  Id.  He also described his December 28, 2006 meeting with Robyn Powell following her child custody hearing.  He acknowledged that she signed the affidavit and she denied any responsibility for the theft.  However, he also said that he "knows" that she has some of his belongings, but she was trying to be nice by signing the affidavit.  Id. at 37.  At the conclusion of the interview, the investigator asked Powell to complete a POL form and he refused on the ground

8

that he had already submitted a POL to Farmers.   After further discussion, Powell agreed to complete a new POL.

Powell resubmitted the same POL that Farmers had received on February 19, 2007, but this version was signed and notarized.  The POL included the same list of 221 items that were allegedly stolen from Powell's house.  Cornwell sent Powell a letter acknowledging receipt of his POL and stating that Farmers would continue to investigate Powell's claim.  Spaeth interviewed Marty Pierce, a former employee of Randy's Roofing.  Pierce stated that Powell attempted to hire him to put siding on Powell's house.  When Pierce came to the house, Robyn Powell told him that Powell could not pay Pierce and Pierce declined to perform the work.  Pierce denied any knowledge of a theft from Powell's home.  Id., Ex. 41.  Spaeth spoke to Powell's mother in Oklahoma City and photographed personal items belonging to Powell.  Johnston told Spaeth that he saw Robyn Powell and other individuals removing items from the home.  Johnston claimed that Powell permitted Robyn Powell to move back in to give their relationship another try.  Id., Ex. 43.

On May 4, 2007, Powell submitted an updated POL with enhanced values for the stolen property.  Specifically, Powell claimed that 356 items were stolen and he suffered $1,600 of damage to his home.  Powell's previous POL identified 221 stolen items and $600 of property damage.  The value of the stolen property also increased from $60,000 to $64,729.55.  After receiving Powell's updated property list, Farmers retained counsel and asked Powell to submit to an EUO.  Powell gave an EUO on June 18, 2007, and subsequently reviewed and signed the transcript.  Powell stated that Robyn Powell periodically called him when she became "upset or depressed."  Id., Ex. 4, at 2.  He allowed Robyn Powell and her children to move back into his home in late August or early September 2006 after she asked to reconcile their relationship.  Id. at 3-4.  He testified that he was

9

in Colorado when the theft occurred and he learned of the theft from Johnston.  Powell met with a police officer after the incident and told the officer that Robyn Powell stole his property.  Id. at 10. Powell located a cell phone number for Robyn Powell but she would not answer his calls.  When he finally talked to her, she allegedly apologized for leaving the way she did but stated that the relationship was over and she was "with Doug now."  Id. at 12.  He continued to call Robyn Powell up to 20 times day to ask her "why she did it."  Id. at 13.  Powell admitted that Robyn Powell could have sold some of his property and the fact that she did not currently possess the stolen items did not unequivocally show that she did not take his possessions.  He also looked through the windows at Robyn Powell's house and saw some of his property.  Powell described his meeting with Powell at Braum's (a local restaurant).  He claims that he prepared the affidavit and asked Robyn Powell to sign it.  Powell admitted that he did not expect Robyn Powell to sign the affidavit, because he knew that she had some of the stolen property.  Id. at 20-21 (stating that Robyn Powell "lied" by executing the affidavit, because he knew she had much of the property).  He also stated that Robyn Powell identified Wade Fisher as someone who may have taken some of Powell's property.  Id. at 19.

After taking the EUO, Farmers attempted to make contact with Robyn Powell.  She agreed to review the property list submitted by Powell to indicate whether she had any of the items on the list.  Id., Ex. 45.  Farmers' attorney also took a statement from Robyn Powell and sent Farmers a summary of the statement.  She stated that she resided in the subject house from August 2006 to October 20, 2006, and she took property belonging to her when she moved out.  Id., Ex. 46.  She cited the divorce decree as the basis for her right of ownership over the property.  She claims that she left any property in the house belonging to Powell.  After reviewing Powell's property list, she

advised Farmers that she has much of the property that was allegedly stolen.  She also discussed her

interaction with Powell concerning his insurance claim.  As summarized by Farmers' retained

counsel, she made the following factual allegations:

10.    Robyn has advised that Mr. Powell told her if she told Farmers she did not take the property that Farmers would have to pay on his claim.

11.    Mr. Powell testified the Affidavit which he submitted represented Robyn's oath that the property was stolen by someone other than Robyn.  Robyn advised she understood the document was intended to represent her statement that property she took belonged to her, that she owned the property she took and that she did not steal any property belonging to Mr. Powell.

12.    Mr. Powell claims that Robyn has refused to discuss what happened to the property.  Robyn has advised that she and Mr. Powell have maintained a line of communication during the claims process, up to and including the morning of August 1, 2007, when she gave her interview by phone.

13.    Robyn has advised that Mr. Powell directed her not to cooperate with Farmers in the investigation [sic] the claim.

14.    Mr. Powell told Robyn not to appear if she received notice from Farmers to give a statement about the claim.

15.    Mr. Powell threatened to retaliate against Robyn if she provided information to Farmers which would preclude his recovery for the loss.

16.    Robyn called Mr. Powell when she was contacted about the claim on the morning she gave her statement.  Mr. Powell specifically directed her to lie to Farmers about property she had so Farmers would pay him for the loss.  Mr. Powell told Robyn that if she told Farmers that she did not have the property, that the insurance company would have to pay him.

Id. at 8.  Robyn Powell also stated that many of the listed items did not exist or the value of the items

was significantly overstated.

Farmers denied Powell's theft loss claim on September 4, 2007.  Farmers provided seven

reasons for its decision to deny Powell's claim:

1.     It is not likely that the property for which you have made claim was stolen;

2.     The property for which you have made claim was taken in whole or in part by one or more regular residents of the insured premises;

3.     The property for which you have made claim was taken in whole or in part by someone who claims a right to such property under a written agreement and a Court has not ruled that a theft occurred;

4.     You intentionally misrepresented and concealed material facts in the presentation of your claim surrounding the loss;

5.     You intentionally misrepresented and concealed material facts on the Proof of Loss surrounding the loss;

6.     You intentionally misrepresented and concealed material facts in your examination under oath surrounding the loss;

7.     You intentionally misrepresented and concealed material information relating to the property claimed.

Id., Ex. 48, at 3.  Plaintiff filed a lawsuit against Farmers in Washington County District Court on October 17, 2007, and Farmers removed the case to this Court on November 13, 2007.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Farmers argues that it properly denied plaintiff's theft claim on the grounds that Robyn Powell was a regular resident of the property and that plaintiff made material misrepresentations in his initial claim, POL, recorded statement, and EUO.  Plaintiff argues that genuine issues of material fact preclude summary judgment because the undisputed facts do not clearly show that Robyn Powell was a regular resident or that plaintiff made a material misrepresentation.

Under Oklahoma law, an insurance contract should be construed according to the terms set out within the four corners of the document.  First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1173 (10th Cir. 2005); Redcorn v. State Farm Fire & Cas.

Co., 55 P.3d 1017, 1020 (Okla. 2002); <u>London v. Farmers Ins. Co., Inc.</u>, 63 P.3d 552, 554 (Okla. Civ. App. 2002). If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." <u>Roads West, Inc. v. Austin</u>, 91 P.3d 81, 88 (Okla. Civ. App. 2004). A court should not create an ambiguity in the policy by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision." <u>Wynn v. Avemco Ins. Co.</u>, 963 P.2d 572, 575 (Okla. 1998). A policy term will be considered ambiguous only if it susceptible to more than one reasonable interpretation. <u>Max True Plastering Co. v. U.S. Fidelity & Guar. Co.</u>, 912 P.2d 861, 869 (Okla. 1996). If an insurance contract contains an ambiguous term, the Court may refer to extrinsic evidence to interpret the insurance policy. <u>Gable, Simmons & Co. v. Kerr-McGee Corp.</u>, 175 F.3d 762, 767 (10th Cir. 1999) (citing <u>Pierce Couch Hendrickson Baysinger & Green v. Freede</u>, 936 P.2d 906, 912 (Okla. 1997)). When construing an ambiguous term in an insurance contract, a court must consider "not what the drafter intended . . . but what a reasonable person in the position of the insured would have understood [the ambiguous provision] to mean." <u>American Economy Ins. Co. v. Bogdahn</u>, 89 P.3d 1051, 1054 (Okla. 2004).

As a preliminary matter, the Court notes that many of plaintiff's alleged factual disputes are not material to the Court's decision and do not prevent the Court from considering defendant's motion for summary judgment. Plaintiff asserts that a factual dispute over Robyn Powell's status as an insured precludes summary judgment. However, Farmers corrected its initial statement on this issue and it did not deny coverage on this basis. Likewise, plaintiff's reason for allowing Robyn Powell to move back into the house is not relevant to a determination of whether she was a regular resident of the house. The undisputed facts show that he allowed her to move in for an indefinite

14

period of time and, whether they were attempting to reconcile or he simply felt sorry for her, plaintiff has not shown that his subjective intent is relevant to the interpretation of the insurance policy.  The issues before the Court are whether Robyn Powell was a regular resident within the meaning of the subject insurance policy, and whether plaintiff made a material misrepresentation to Farmers during the claim review process.

The policy does not define the term "regular resident" and the Court must construe the plain language of the insurance policy as required by Oklahoma law.  The policy excludes coverage for a theft claim if the theft was "committed by any **person** regularly residing on the **insured location**." Dkt. # 28, Ex. 1, at 4.  There is no dispute that the theft was committed by a person from the insured location, but plaintiff disputes that Robyn Powell was a regular resident of his house.  The undisputed facts show that plaintiff permitted Robyn Powell and her five children to move into his home in August 2006 and she and children resided at the house until about October 20, 2006.  The summary judgment record also contains numerous statements by plaintiff that Robyn Powell stole part or all of his property.  Although he made contradictory statement that unidentified others stole some of his property, there is no dispute that plaintiff accuses Robyn Powell of stealing some of his property.  Plaintiff's claims handling expert, Robert Stephens, believes that Robyn Powell and her family were responsible for the entire theft based on his interview with witnesses. Id., Ex. 49, at 42.

Even if the Court were to assume that Robyn Powell was a regular resident of the house, the Court finds that a genuine issue of material fact as to the identity of the person who took plaintiff's property precludes summary judgment on plaintiff's breach of contract claim.  To resolve this issue, the Court would be required to make a credibility finding concerning which of the various statements made by plaintiff or Robyn Powell is true, and this issue must be submitted to a jury.

Although the Court appreciates Farmers' frustration with the conflicting stories offered by plaintiff and his ex-wife, the Court can not resolve this issue on summary judgment.  Powell has stated that Robyn Powell took all or part of his property and, alternatively, he has accused unidentified others of stealing his property.  Dkt. # 28, Ex. 6, at 1 (Powell's initial phone to call Farmers on October 25, 2006, in which he identified Robyn Powell as the thief); id., Ex. 9 (Powell called Farmers on October 26, 2006 stating that unknown persons other than Robyn Powell stole some of his property); id., Ex. 13 (Powell told Sanders that Robyn Powell took only property belonging to her and her children and unidentified others stole the remainder of the property); id, Ex. 36 (Powell accused Robyn Powell stealing his property and, although she may have had help, she was responsible for the theft); id., Ex. 2, at 6 (recorded statement in which Powell denies any actual knowledge of who stole his property and claimed his initial identification of Robyn Powell as the thief was emotionally driven); id., Ex. 4, at 13-18 (Powell's statements during EUO that Robyn Powell alone stole his property and, even if she does not currently have all of the property, she may have sold some of it). Likewise, Robyn Powell signed an affidavit stating that she did not take any property from plaintiff's house, id., Ex. 15, but subsequently told Farmers that she took much of the missing property, id., Ex. 46 (summary of Robyn Powell's recorded statement to Farmers where she admits to taking much of the property identified on Powell's list of allegedly stolen property).  This is precisely the kind of factual issue reserved for the finder of fact and, even if Robyn Powell were a regular resident, there are other genuine issues of material fact precluding summary judgment. Construing the facts in plaintiff's favor, it is possible that someone other than Robyn Powell stole some of his property and plaintiff may have a partially valid claim under the insurance policy.

16

Further, assuming there were a theft of some or all of the property, the disputed value (amount of loss) is for the finder of fact.

Farmers argues that summary judgment is still appropriate, because the disputed facts show that plaintiff intentionally made material misrepresentations during the claims process. Under Oklahoma law, every homeowner's insurance policy must have the following language:

> Concealment, fraud. This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

OKLA. STAT. tit. 36, § 4803(G). The purpose of this type of provision is to "enable the [insurer] to possess itself of all knowledge, in regard to the facts, material to its rights, to enable it to decide upon its obligations, and to protect it against false claims." Long v. Ins. Co. of North America, 670 F.2d 930, 933-34 (10th Cir. 1982) (quoting Clafin v. Commonwealth Ins. Co., 110 U.S. 81, 94 (1884)). "Most courts have construed materiality broadly, emphasizing that the subject of the misrepresentation need not ultimately prove to be significant to the disposition of the claim, so long as it was reasonably relevant to the insurer's investigation at the time." Wagnon v. State Farm Fire & Cas. Co., 146 F.3d 764, 768 (10th Cir. 1998). Whether a statement by the insured constitutes a material misrepresentation is a mixed question of law and fact. Long, 670 F.2d at 934.

During the claims handling process, plaintiff made numerous and often conflicting statements about who allegedly stole his property, what property was stolen, and the value of the property. The Court has already noted that it would be required to weigh the evidence in the summary judgment record to determine whether Robyn Powell, or some unidentified person, actually took some or all of plaintiff's property. Based on the summary judgment record, it is

possible that plaintiff made a misrepresentation subsequent to filing his theft claim.  If plaintiff willfully misrepresented to Farmers that someone other than Robyn Powell stole his property, this would be a material misrepresentation of fact.  <u>Wagnon</u>, 146 F.3d at 768 (misrepresentation considered material under Oklahoma law if "a reasonable insurance company, in determining its course of action, would attach importance to the fact misrepresented.").  However, the Court has already determined that genuine issues of material fact exist as to whether property was stolen, who stole it, and its value.  Therefore, there is also a genuine issue of material fact as to whether plaintiff made a material misrepresentation during the claims handling process, and this precludes summary judgment on Farmers' defense that plaintiff's material misrepresentation voided the insurance policy.

## IV.

Farmers seeks summary judgment on plaintiff's bad faith claim, because it asserts that it had a legitimate basis to deny his theft claim.  Even if there is a genuine issue of material fact precluding summary judgment on breach of contract, Farmers contends that there is no evidence supporting plaintiff's claim that Farmers denied his claim in bad faith.  Plaintiff responds that Farmers' actions were so unreasonable that, even if a legitimate coverage dispute existed, he should be permitted to proceed with his bad faith claim.

Under Oklahoma law, "an insurer has an implied duty to deal fairly and act in good faith with its insured." <u>Christian v. Am. Home Assurance Co.</u>, 577 P.2d 899, 904 (Okla. 1977).  Violation of this duty gives rise to an action in tort.  <u>Id.</u>  "The essence of the tort of bad faith, as it is recognized in Oklahoma, is the unreasonableness of the insurer's actions." <u>Conti v. Republic Underwriters Ins. Co.</u>, 782 P.2d 1357, 1360 (Okla. 1989).  The Oklahoma Supreme Court and the

Tenth Circuit have made clear that an insurer does not subject itself to a claim of bad faith merely by disputing coverage.  "The insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate.'" Thompson v. Shelter Mut. Ins., 875 F.2d 1460, 1462 (10th Cir. 1989) (citing Manis v. Hartford Fire Ins. Co., 681 P.2d 760, 762 (Okla. 1984)). "The decisive question is whether the insurer has a 'good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under the policy.'" Buzzard v. Farmers Ins. Co., Inc., 824 P.2d 1105, 1109 (Okla. 1991) (quoting Buzzard v. McDanel, 736 P.2d 157, 159 (Okla. 1987)).  In order to succeed on a claim for bad faith, the claimant must be able to prove that the insurer's actions went beyond an act of simple negligence; however, it is not necessary to prove that the insurer acted recklessly to prove liability, even though recklessness is a requirement for punitive damages in a bad faith claim.  Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1094 (Okla. 2005).  The Court can consider only the "facts known or knowable about the claim at the time the insured requested the insurer to perform its contractual obligation." Sims v. Travelers Ins. Co., 16 P.3d 468,  471 (Okla. Civ. App. 2000); see also Timberlake Construction Co. v. United States Fidelity & Guaranty Co., 71 F.3d 335, 340-41 (10th Cir. 1995).

Based on the facts existing at the time Farmers denied coverage, the Court finds that Farmers had a legitimate basis to dispute the existence of insurance coverage and there is no evidence that Farmers acted unreasonably when it denied plaintiff's theft claim.  Even if there is a genuine issue of material fact on his breach of contract claim, this does not automatically entitle plaintiff to a jury trial on the issue of bad faith.  Buzzard v. Farmers Ins. Co., Inc., 824 P.2d 1105, 1109 ("The tort of bad faith does not foreclose the insurer's right to deny a claim.  An insurer clearly has the right to

19

resist payment and litigate any claim to which the insurer has a *reasonable defense*."); see also Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993) ("The mere allegation that an insurer breached the duty of good faith and fair dealing does not automatically entitle a litigant to submit the issue to a jury for determination."). The relevant issue is not simply whether plaintiff may or may not prevail on his breach of contract claim. The Court must examine the record to determine whether "the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of the duty of good faith and fair dealing." Badillo, 121 P.3d at 1094.

Farmers denied plaintiff's theft claim for seven reasons, and those reasons are supported by the evidence. See Dkt. # 28, Ex. 48, at 3. Although there are genuine issues of material fact as to theft and value, this does not automatically make Farmers' decision to deny his claim unreasonable. Farmers denied plaintiff's claim for the following reasons:

1. It is not likely that the property for which you have made claim was stolen;

2. The property for which you have made claim was taken in whole or in part by one or more regular residents of the insured premises;

3. The property for which you have made claim was taken in whole or in part by someone who claims a right to such property under a written agreement and a Court has not ruled that a theft occurred;

4. You intentionally misrepresented and concealed material facts in the presentation of your claim surrounding the loss;

5. You intentionally misrepresented and concealed material facts on the Proof of Loss surrounding the loss;

6. You intentionally misrepresented and concealed material facts in your examination under oath surrounding the loss;

7. You intentionally misrepresented and concealed material information relating to the property claimed.

20

Id. at 3.  Farmers had a legitimate factual basis to conclude that Robyn Powell was a regular resident of the house and, based on plaintiff's and Robyn Powell's statements, that Robyn Powell was responsible for taking the property.  Plaintiff admits that he allowed Robyn Powell and her five children to move into his house for an indefinite period of time.  Whatever plaintiff's subjective reason for permitting Robyn Powell and her family to move in, it is clear that Robyn Powell lived in the house with plaintiff's permission and she had no intention of establishing a permanent residence elsewhere at the time she moved in.  Id., Ex. 4, at 7.  Even if there is ultimately a genuine issue of material fact concerning whether anyone stole some or all of the property, Farmers' investigation uncovered a substantial body of evidence showing that Robyn Powell, acting alone or with persons under her control, took all of the property and Farmers' decision to deny plaintiff's claim on this policy exclusion was reasonable.  Farmers also denied plaintiff's theft claim based on alleged misrepresentations in his statements to Farmers, and this is also supported by the record.  The Court has cataloged plaintiff's numerous conflicting statements, see supra, at 16, and plaintiff makes no attempt to clarify his various versions of the alleged theft.  Although plaintiff suggests his story changed based on "new information," he has not identified the source of any new information and he has not satisfied his burden to produce evidence supporting this factual allegation.  See Dkt. # 32, at 9.  Robyn Powell also told Farmers that Powell asked her not to cooperate with Farmers' investigation and he threatened to retaliate against her if she provided any information to Farmers supporting denial of his claim.  Dkt. # 28, Ex. 45, at 8.  It is clear that Farmers had a legitimate basis to conclude that material aspects of plaintiff's statements were false, and this was also a legitimate coverage dispute precluding a finding of bad faith against Farmers.

Plaintiff claims that Farmers' motion for summary judgment should be denied as to bad faith, even if there is a legitimate coverage dispute, because its handling of plaintiff's claim was unreasonable.  See Vining on Behalf of Vining v. Enterprise Fin. Group, Inc., 148 F.3d 1206 (10th Cir. 1998) (even if insurer had a legitimate basis to deny the insured's claim, insurer may be held liable for bad faith if its handling of the plaintiff's insurance claim was unreasonable).  However, this argument is not supported by the summary judgment record.  Farmers repeatedly extended plaintiff's deadlines to submit required documents and evidence supporting his claims, and gave plaintiff multiple opportunities to clarify his contradictory statements.  After giving plaintiff a full opportunity to support his claim, Farmers assigned an investigator to the case and interviewed the relevant witnesses to determine if plaintiff's claims had any validity.  Plaintiff relies heavily on Farmers' initial misconception that Robyn Powell was still an insured on the policy on October 20, 2006.  Farmers corrected this statement in a timely manner and did not rely on it as a basis to deny plaintiff's claim.  Thus, the Court finds that this does not create an inference that Farmers acted unreasonably during the course of its investigation.  Plaintiff also argues that Farmers accepted Robyn Powell's statements over plaintiff's version of events "even though they know [her] to be a liar."  Dkt. # 32, at 24.  During its investigation, Farmers did not have to disregard Robyn Powell's statements simply because plaintiff's statement conflicted with hers.  Farmers had a duty to fully investigate plaintiff's claims and this included interviewing highly relevant witnesses such as Robyn Powell.  Plaintiff's assertion that Farmers gave Robyn Powell's statements undue weight is not supported by the record.

Even if plaintiff ultimately prevails on his claim for breach of contract, Farmers has shown that a legitimate coverage dispute exists and it has the right to dispute coverage in court without

incurring liability for bad faith.  <u>Manis v. Hartford Fire Ins. Co.</u>, 681 P.2d 760, 762 (Okla. 1984).

Plaintiff has cited no law supporting his argument that Farmers was obligated to pay his claim

simply because his own statements conflicted with other evidence gathered by Farmers.  Dkt. # 32,

at 26.  Farmers has identified legitimate coverage issues that supported its denial of plaintiff's theft

claim and its conduct during the claims process was reasonable.  Therefore, Farmers is entitled to

summary judgment on plaintiff's bad faith claim.

      **IT IS THEREFORE ORDERED** that  Farmer's Insurance Company, Inc.'s Motion for

Summary Judgment (Dkt. #28) is **granted in part** and **denied in part:**  it is **granted** with respect

to plaintiff's claim for bad faith; it is **denied** with respect to plaintiff's claim for breach of contract.

      **DATED** this 8th day of August, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

23